# UNITED STATES BANKRUPTCY COURT
### FOR THE EASTERN DISTRICT OF VIRGINIA
### NEWPORT NEWS DIVISION

| | |
|---|---|
| In re:    KI S. KANG, | Case No. 04-52179-DHA |
| Debtor. | Chapter 7 |

UNOK HA and
K.C. BREDBOY,

    Plaintiffs,

v.                                                                                             APN 04-5072

KI S. KANG and
RICHARD W. HUDGINS, TRUSTEE,

    Defendants,

And

RICHARD W. HUDGINS, TRUSTEE,

    Plaintiff,

v.                                                                                             APN 04-5075

KI S. KANG,

    Defendant.

---

### MEMORANDUM OPINION AND ORDER

---

1

These matters came before the Court on Ha and Bredboy's[1] Motion to Determine the Dischargeability of Debt and the Trustee's Objection to Discharge. The motion and the objection were consolidated for trial as both pertain to the portion of Kang's debt resulting from the collapse of a Korean gae and are supported by the same evidence.

A gae has been explained by the parties as a traditional Korean custom akin to a "savings plan" utilized by women in that culture. This Court must determine whether the debtor, as the organizer of the gae, acted in a fiduciary capacity, and if so, breached her fiduciary duty thereby prohibiting her from discharging the portion of her debt arising from the 2003 gae, pursuant to 11 U.S.C. § 523(a)(4).

Additionally, the Court must determine whether the debtor has failed to adequately explain the "loss of assets or the deficiency of assets to meet the debtor's liabilities," 11 U.S.C. § 727(a)(5), such that her discharge should be denied.

This is a core proceeding over which this Court has jurisdiction under 28 U.S.C. §§ 157(b)(2) and 1334(b). Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409. After taking the matter under advisement, we make the following Findings of Fact and Conclusions of Law.

**FINDINGS OF FACT**

In June 2003 the debtor organized a gae with 11 members. A gae, as testified to by Ha, Bredboy, and Kang, is a traditional Korean "savings plan" utilized by women in that culture to

---

[1] This plaintiff's name has been misspelled in the pleadings and is actually K.C. Brayboy. The Court will continue to refer to the plaintiff as Bredboy for consistency.

enable them to do certain things, such as purchase furniture or pay for education.[2]  In this case, the gae was to operate for 25 months, numbered sequentially, with one of the 11 members "owning" each month.  The members were to pay to the oya (see below) $1,000.00 per month for each month she owned, plus $100.00 interest beginning the month after their "owned" month is paid out to them.[3]

The woman who organizes the gae is the "oya" or "caller" and is responsible for collecting the money each month from all members and paying out $25,000 per month, plus interest to the members owning months 3 through 25.  The total time that the oya is supposed to be in possession of the funds is approximately 1-2 days.  In this case, the money was due to the debtor, the oya, on the 5th of each month and she was to pay the owning member on the 6th or 7th.  Regardless of whether the oya is able to collect that month's payment from each of the members, she is responsible for paying each member in full.  The benefit to the oya for organizing the gae is that she receives payment in the first month and is not required to pay any interest for that month's payment.[4]

Conducting a gae is quite informal: no receipts are given to evidence payments made to the oya or to the members.  The witnesses stressed that everyone always trusts the oya and each participant takes their obligation to make the monthly payments very seriously.[5]

---

[2] Bredboy testified that she chose the last month because that is when she would need the money to pay for her two granddaughters' college educations.
[3] A member only pays interest after she is paid for a particular month.  For example, if a member owns months 2 and 24, she would begin paying interest in month 3 on her payout in month 2 and she would continue to pay that $100.00 interest every month through the end of the gae, totaling $2,300.00 interest on month 2.  She would not pay interest on month 24 until after she was paid for month 24, so month 25, totaling $100.00 interest on month 24.
[4] If the oya owns more than one month she must pay interest on those months.

3

The only evidence of the gae was the debtor's handwritten document delineating each month's number and its owner.[6] According to this document, the debtor's name or a Korean notation translated as "myself," is written beside numbers 1, 4, 6, 8, 10, 11, and 19 however, the debtor denies that she actually owned all of those months. She testified that she only owned months 1 and 8, and the other months were owned by other members of the gae. She stated that she wrote her name by all of the above-referenced numbers because she did not know the other owners' real names. She explained that in Korean culture people are not referred to by their actual names, but rather by pseudonyms such as "Auntie."[7] Therefore, she wrote her own name or "myself" by months numbered 4, 6, 10, 11, and 19 rather than writing "Auntie" because many people were referred to as "Auntie." The debtor stated she felt comfortable doing this because she knew the true owner of each month. Additionally, Heyona Cassidy testified that she knew that the debtor was not the owner of months 10, 11, and 19, as Cassidy's friends owned those months. Cassidy stated she was involved when her friends bought the three months and acted on their behalf, dropping off monthly payments and picking up payouts in months 10 and 11.

Ha and Bredboy testified they were not aware that the debtor did not own all of the months delineated by Kang's name. They also testified that they did not know all the members of the gae, which is not uncommon, but that the oya does know every member, as she recruits them.

---

[5] Bredboy likened the gae payment to a mortgage payment in terms of how seriously it was to be taken by the members.

[6] Actually two documents were introduced, one evidencing a 2002 gae that the debtor had organized and paid out fully and the one regarding the current gae. These notes were written in Korean and translated for counsel by Ha. Ha also participated in the 2002 gae with Kang.

[7] Debtor stated that she did not even know Unok Ha's name until the date of the trial.

4

Ha and Bredboy further testified they paid the debtor $4,000 and $1,000, respectively, every month from June 2003 until August 2004,[8] with Ha ultimately paying $60,300 and Bredboy paying $15,000.[9] Both Ha and the debtor testified that Ha received a $25,000 payment in July 2003, but only received $15,000 in May 2004. Both women considered the $10,000 deficiency in the May payment a loan. Ha testified that she reported to several others that she did not receive her full payment in May 2004 and said she learned that two other members had received similar treatment. Ha testified that she was aware of Kang's financial difficulties, but that she felt compelled to continue making gae payments based on the trust she had for Kang and the seriousness of the gae obligation.

Bredboy never received any payment during the gae.

Kang testified that she received a total of $48,000 from the gae, $25,000 in month 1 and $23,000 in month 8.[10] She further testified that with the first payment she repaid a $10,000 personal loan from Kim Yon Boon and paid the interest on a $60,000 personal loan from Mrs. Kyung Hui. With the payment received in month 8, Kang testified she used it to pay a gae obligation of $5,000 and another $10,000 personal loan.

The gae in this case was to operate from June 2003 to June 2005, however, the debtor filed for relief under Chapter 7 of the Bankruptcy Code on August 6, 2004 effectively terminating the gae. Kang stated that she paid the owner of every month in full until May 2004. She stated that she became unable to pay because the owner of months 4 and 6 stopped paying

---

[8] Ha also paid interest beginning in month 3, from August 2003 until August 2004.
[9] Kang disputes that she received payment for August 2004 from Bredboy, however, her bankruptcy schedules list a gae debt to Bredboy for $15,000. Kang testified that was a mistake as it should have read $14,000.
[10] The lesser amount in month 8 is a reflection of her testimony that the owner of months 4 and 6 was not making her $2,000 monthly payment, as required.

her the $2,000 owed per month and that her own "business was bad," so she simply did not have the money. She stated she was borrowing from others to cover her obligations each month.

The debtor's bankruptcy schedules list assets valued at $1,148.00 and debts in the amount of $272,391.00. Debtor amended her schedules on September 29, 2003 to include additional personal loans and "GAE obligations," bringing her total debt to $311,391.00. Kang does not claim that any member of the gae owes her money personally, but rather that they owe the gae money; she continually tried to consider herself separately from the gae.

## CONCLUSIONS OF LAW

### A. § 523(a)(4) Claim

The ability to discharge debt pursuant to the bankruptcy code was designed to provide debtors with a fresh financial start. In re *Sparrow*, 306 B.R. 812, 812 (Bankr. E.D. Va. 2003). There are exceptions to the dischargeability of debt which are enumerated in 11 U.S.C. § 523, but these exceptions are to be construed narrowly given the overall purpose of bankruptcy. *Id*; In re *Heilman*, 241 B.R. 137, 148 (Bankr. D. Md. 1999). Section 523 (a)(4) excepts a debtor from discharging a debt "for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny." 11 U.S.C. § 523(a)(4) (West 2004). The plaintiff must prove all the elements of this exception by a preponderance of the evidence. *Heilman*, 241 B.R. at 148.

There can be no fiduciary, however, without first having a special relationship between the parties that creates that higher duty. In this case, it has been alleged by the plaintiffs that a trust was created when the gae was formed.

1. *Was a trust created?*

Whether a trust has been formed is generally a question of state law. In re *Holmes*, 287 B.R. 363, 374 (Bankr. E.D. Va. 2002). Virginia law recognizes three basic forms of trust; express, constructive, and resulting. In re *Dameron*, 155 F.3d 718, 722 (4th Cir. 1998) (citing *Leonard v. Counts*, 221 Va. 582, 272 S.E.2d 190, 194-95 (Va. 1980)).

> An express trust arises 'when parties affirmatively manifest an intention that certain property be held in trust for the benefit of a third party.' *Dameron,* 155 F.3d at 722; *accord Peal v. Luther,* 199 Va. 35, 97 S.E.2d 668, 669 (Va. 1957); 76 AM. JUR. 2D *Trusts* § 65 (1992). Resulting and constructive trusts, by comparison, do not depend on any manifestation of intent, but instead arise by operation of law in certain circumstances. *Leonard,* 272 S.E.2d at 194. A resulting trust arises 'when one person pays for property, or assumes payment of all or part of the purchase money, but has title conveyed to another with no mention of a trust in the conveyance.' *Id.* Constructive trusts, in turn, arise to prevent fraud or injustice. *Id.* at 195.

*Cody v. United States*, 348 F. Supp. 682, 692 (E.D. Va. 2004).

Within this framework of trusts, it is important to turn the analysis now to the term "fiduciary." The question of whether the debtor was acting as a fiduciary is one of federal law. *Heilman*, 241 B.R. at 158. Within the bankruptcy context, "fiduciary" has long since been more narrowly construed, applying only to express trusts. *Davis v. Aetna Acceptance Co.*, 293 U.S. 328, 333 (1934); *Chapman v. Forsythe*, 43 U.S. (2 How.) 202 (1844); In re *Sparrow*, 306 B.R. 812, 827 (Bankr. E.D. Va. 2003); In re *Holmes*, 117 B.R. 848, 853-54 (Bankr. D. Md. 1990); In re *Lewis*, 94 B.R. 406, 409 (Bankr. E.D. Va. 1988). The Eastern District of Virginia is no exception, and has "restrict[ed] the term 'fiduciary' as used in § 523(a)(4) to 'the class of fiduciaries including trustees of specific written declarations of trust, guardians, administrators,

7

executors or public officers and, absent special considerations, does not extend to the more general class of fiduciaries such as agents, bailees, brokers, factors and partners.'"[11] *Sparrow*, 306 B.R. at 828 (quoting *Wager v. Lewis*, 94 B.R. 406, 410 (Bankr. E.D. Va. 1988). Therefore, the only way the plaintiffs can prevail is if the parties created an express trust.

In Virginia an express trust can be created in one of two ways, the use of words or circumstances that unambiguously demonstrate the parties' intent to create a trust for the benefit of a third party, *Dameron*, 155 F.3d at 722; *Cody*, 348 F. Supp. 2d at 692; *Heilman*, 241 B.R. at 161, or "the actual transfer of property to a trustee [to] effect the requisite separation of legal and equitable interests necessary to create an express trust." *Cody*, 348 F. Supp. 2d at 692-93; *Heilman*, 241 B.R. at 161. It is enough if the intention to create a trust is coupled with a reasonably certain statement of the "subject matter, purposes, and beneficiar[ies]" of the trust.

---

[11] *Sparrow continues,*
> It appears the Fourth Circuit Court of Appeals has not weighed in on this distinction in any published decision. However, in two unpublished decisions, the Fourth Circuit has endorsed the notion that an express or technical trust must arise to impose liability under § 523(a)(4). *See Bradley v. Kelley (In re Kelley)*, 948 F.2d 1281 (4th Cir. 1991) (unpublished table decision) (holding that since Virginia statute did not create a trust *res* or impose trust responsibilities, debtor who was president of company issuing defaulted securities was not in fiduciary relationship); and *Harrell v. Merchant's Express Money Order Co. (In re Harrell)*, 173 F.3d 850 (4th Cir. 1999)(unpublished table decision) (holding that "under this section [523(a)(4)], a fiduciary is limited to instances involving express or technical trusts."); *But see Airlines Reporting Corp. v. Ellison (In re Ellison)*, 296 F. 3d 266, 271 (4th Cir. 2002) ("Based on the confluence of: (1) the [debtor's] personal guarantees to ARC [the creditor] of Sovereign Travel [the debtor's corporation] indebtedness; (2) the fact that Sovereign Travel's indebtedness arose from Sovereign Travel's breach of its fiduciary duty to ARC; (3) the fact that Sovereign Travel's breach of a fiduciary duty was brought about by the Ellison's personal conduct and (4) the fact that the Ellison's conduct amounted to a breach of their fiduciary duty to Sovereign Travel, we conclude that the Ellison's indebtedness to ARC under the personal guarantees was from their defalcation while acting in a fiduciary capacity and therefore is not dischargeable in bankruptcy under 11 U.S.C. § 523(a)(4)").

*Sparrow*, 306 B.R. at 828.

*Holmes*, 287 B.R. at 376.   The pivotal question, however, is really one of intent.  *Id*. at 377; *Heilman*, 241 B.R. at 161.

Circumstances that evidence the clear intent to create a trust arise when a depositor "place[s …] fund[s] irrevocably beyond his control and [] devote[s them] to [an] indicated purpose." *Schloss v. Powell*, 93 F.2d 518, 519 (4th Cir. 1938); *See Holmes*, 287 B.R. at 375-76.

In the instant case, the plaintiffs argue that the gae document (Pl.'s Ex. A), written by the debtor, is an agreement that creates an express trust.  They state that the debtor acted as a pseudo "bank," whose obligation was to collect the monthly payment from all the members and pay each month's owner the appropriate amount due.

Plaintiffs further argue that the debtor saw the gae as a separate entity and her duty as one of a fiduciary, evidenced by her admission that no money was owed to her on the unpaid gae obligations, but rather owed to the gae.

Defendant debtor states that gaes are Korean traditions operated with little to no documentation.  Debtor argues that the gae document produced does not rise to the level of an express trust, which must be narrowly construed.  Additionally, the debtor argues that she held the money for only one to two days, which is inconsistent with a trust. The debtor then reasons that she can not be a fiduciary, as there was no trust.

In Virginia a trust document is not necessary to create an express trust.  An express trust can be created by circumstances that clearly evidence the intent to create a trust or the separation of legal and equitable interests of the res for the benefit of a reasonably identified third party.  In this case, the debtor found 11 women who agreed to "buy" months in a 25 month gae.  These women further agreed to pay the debtor $1,000 per month for each month they owned.  The

9

members of the gae before the court, Ha and Bredboy, testified they were told that each month one of the members would be paid $25,000 (the money the debtor collected each month). Each woman testified as to the seriousness of paying her gae obligation and that she would never be late or renege on her obligation, as the money was owed to the owner of that month.

It is obvious to the court, that while the gae document written by the debtor, by itself, may not rise to the level of an express trust, the circumstances as a whole do create such a trust. Ha and Bredboy deposited money with the debtor each month knowing that they no longer had control of that money. They further knew that a third person, the owner of that month, would receive the money. There can be no doubt that the money, or res, was actually transferred from Ha and Bredboy to the debtor, such that legal and equitable interests separated. These facts show a very clear intention that the money "was vested in one person, to be held in some manner or for some purpose on behalf of another…." *Dameron*, 155 F.3d at 722 (internal quotations and citations omitted). In this case, there was an express trust.

While the Court agrees with the debtor that holding the money for such a short period of time, one to two days, is not the normal length of time fiduciaries are in possession of the subject matter of a trust, that fact is in no way dispositive in this case. There is no statute or case law that requires a person to hold money for a certain period of time before becoming a fiduciary. If all the requirements as discussed above are met, as they are in this case, the amount of time the person holds the money is of no consequence.

    2. *Breaching the Fiduciary Duty*

Again, § 523 (a)(4) excepts a debtor from discharging a debt "for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny." 11 U.S.C. § 523(a)(4) (West

2004). There has been no allegation that the debtor committed any embezzlement, or larceny or engaged in any type of fraud; therefore, the Court will focus its discussion and analysis on allegations of the debtor's defalcation while acting in a fiduciary capacity.

A defalcation is the "'misappropriation of trust funds or money held in any fiduciary capacity; [or the] failure to properly account for such funds.'" In re *Ansari*, 113 F.3d 17, 20 (4th Cir. 1997) (quoting In re *Niles*, 106 F. 3d 1456, 1460 (9th Cir. 1997)). However, the Fourth Circuit has found that it is not necessary that an act "'rise to the level of …"embezzlement," or even "misappropriation"'" to be held a defalcation. In re *Uwimana*, 274 F.3d 806, 811 (4th Cir. 2001) (quoting *Ansari*, 113 F.3d at 20 (citations omitted)). Thus, there is no requirement of wrongdoing on the part of the fiduciary and even an innocent mistake, resulting in the misuse of or failure to account for funds, can qualify as a defalcation. *Uwimana,* 274 F.3d at 811; In re *Davis*, 262 B.R. 673, 684 (Bankr. E.D. Va. 2001). The plaintiff carries the burden of proof by a preponderance of the evidence. *Niles*, 106 F.3d at 1464.

Here, the plaintiffs argue that the debtor misused or failed to account for the money received from Ha and Bredboy during the gae and was ultimately unable to complete the gae, leaving Ha and Bredboy without their expected payouts.

Plaintiffs presented evidence that Ha owned four months and that the debtor received monthly payments of $4,000 from Ha from June 2003 through August 2004, totaling $60,300.[12] Ha received a $25,000 payment in July 2003, but for the second month she owned the debtor only paid her $15,000, rather than $25,000. Ha received no money for the last two months she

---

[12] This amount takes into account interest paid.

11

owned. Additionally, Bredboy, who owned only one month, paid the debtor at least $14,000 during the gae, but received nothing in return.

The debtor argues that because the owner of months 4 and 6 was no longer paying her share and because the debtor herself was unable to meet her obligations for the two months she owned, that she was unable to continue making the gae payments. She claims the gae still owes her money as well.

The Court does not find the debtor's argument persuasive as it applies to Ha's second expected payout. The debtor was collecting $25,000 per month and even if owners of four of the months were not paying their share, $21,000 should have been available each month to pay to the owning member. It is illogical that the debtor was unable to pay Ha at least $21,000 in the month of May 2004 without inferring that the debtor somehow misappropriated the funds.

This issue is not quite as clear regarding Bredboy's payout. Bredboy paid $1,000 per month for the first 14 or 15 months and expected to receive $25,000 in the last month of the gae, August 2005. All the money Bredboy paid to the debtor was, in theory, paid out every single month to the owning member. Because of the nature of the gae, all the members had the use of every other member's money for at least one month, but the debtor, as the fiduciary of this trust, had the added responsibility of insuring that all the members had that opportunity. Bredboy paid her $15,000 as she was obligated to do, but never received the return of her $25,000 plus interest. It was the debtor's responsibility to return Bredboy's money and she did not. While the debtor claims hardship as a result of other's failure to pay and her own financial difficulties, those reasons do not negate her defalcation while acting in a fiduciary capacity. The debtor breached her fiduciary duty to both Ha and Bredboy.

**B. § 727(a)(5) Claim**

Section 727(a)(5) provides that "[t]he court shall grant the debtor a discharge, unless the debtor has failed to explain satisfactorily,…any loss of assets or deficiency of assets to meet the debtor's liabilities." 11 U.S.C. § 727(a)(5) (West 2004). Should a debtor be unable to "'adequately explain a shortage, loss or disappearance of assets," the Court has the authority to refrain from granting a discharge. In re *King*, 3 Fed. Appx.147, 151 (4th Cir. 2001) (unpublished) (citing In re *Martin*, 698 F.2d 883, 886 (7th Cir. 1983)).

Initially, the objecting party must establish the basis for the objection, then the burden shifts to the debtor to provide an adequate explanation. In re *Farouki*, 133 B.R. 769, 777 (Bankr. E. D. Va. 1991), aff'd 14 F.3d 244, 251 (4th Cir. 1994). The "explanation must be reasonable and credible so as to satisfy the court that the creditors have no cause to wonder where the assets went." *Id*. Should the debtor fail to provide any corroborating documentation, that fact may be a basis for denying the discharge. *Id*. "Vague and indefinite explanations of losses that are based upon estimates uncorroborated by documentation are unsatisfactory." In re *Chalik*, 748 F.2d 616, 619 (11th Cir. 1984). Whether the debtor has provided a satisfactory explanation as to the loss of assets is a question of fact. *Id*.

The plaintiffs argue that according to the gae document, the debtor received a total of $100,000 from the gae for months 1, 4, 6, and 8 and that she has not accounted for those monies. Plaintiffs further argue that the debtor's bankruptcy schedules are inaccurate regarding her debts as a result of running the gae, and that the lack of records regarding the gae creates a financial blackhole, all of which makes it impossible for anyone, especially the trustee, to understand her financial condition. Therefore, her discharge should be denied.

13

The debtor argues that her schedules, as amended, are accurate. She states they include all of her obligations for personal loans and debt from the current and previous gaes. The debtor also argues that gaes are a Korean tradition and that recordkeeping is not a part of that tradition. Gaes are cash based transactions, receipts are not given, nor are they expected. As for the money she received from the gae, she argues she was not the owner of months 4 and 6 and did not receive any payout during those months. She states that she did receive $48,000 for months 1 and 8 and that she used those monies to pay previous gae and personal loan obligations.[13] The debtor believes she has adequately accounted for the money she was paid and should receive her discharge.

The debtor listed her name or a notation translated as "myself" beside seven months of the gae, three of which were proven during the trial to be owned by someone other than the debtor. The plaintiffs did not prove that the debtor owned months 4 and 6, therefore, the debtor does not have to account for any monies paid out during those months. The plaintiffs did established, by the debtor's own admission, that the debtor received $48,000 as payouts for months 1 and 8.[14] The Court holds that the debtor did not adequately account for the expenditure or loss of those monies. The debtor testified that she repaid $25,000 in personal loans and previous gae obligations and an undisclosed amount of interest on a $60,000 personal loan. The debtor did not produce any receipts or documentation for any of these payments. While the Court understands that other cultures may operate differently, it is within the American court

---

[13] See the facts section, *infra*, for a discussion of the debts paid with the $48,000.
[14] *See infra* note 10 for an explanation of the shortfall of the two months combined payout.

system that this debtor is seeking relief. As such, she is required to produce documentation to satisfy her responsibilities under the Code and has not done so.. *See* In re *Escobar*, 53 B.R. 382, 384 (Bankr. S.D. Fla. 1985)(denying discharge under § 727(a)(3) to a debtor for failing to keep adequate records even though foreign custom did not require records); *cf. Carragan v. Commissioner*, 1951 Tax Ct. Memo LEXIS 291, (holding that a payment made to an employee of a Japanese run company was severance pay for income tax purposes despite the Japanese custom of paying "tear money" to a departing employee as a gift).    The debtor provided undocumented testimony of the repayment of loans for only a portion of the $48,000 and offered no explanation as to the remainder. This does not satisfy the debtor's burden under § 727(a)(5) and, therefore, the debtor should be denied a discharge.

## CONCLUSION

We have determined that the following resolution of the issues presented is appropriate under the facts of this case and the law as applied to those facts:

1. Plaintiffs have proven by a preponderance of the evidence that an express trust existed between the defendant debtor, Ki S. Kang and the members of the gae and in particular the plaintiffs, Unok Ha and K. C. Bredboy, and further that the debtor was the fiduciary of that trust.

2. Debtor breached her fiduciary duty by defalcation, therefore the debt owed to Unok Ha in the amount of $10,000, plus interest, and the debt to K.C. Bredboy in the amount of $15,000, plus interest is non-dischargeable.

3. Debtor has not adequately explained the loss of her assets, at least in the amount of

15

$48,000, therefore her discharge is denied pursuant to 11 U.S.C. § 727(a)(5).

**IT IS SO ORDERED.**

Newport News, Virginia
May 26, 2005

_____
DAVID H. ADAMS
United States Bankruptcy Judge

Copies to:   Richard C. Langhorne
             Irving B. Goldstein
             Richard W. Hudgins, Trustee